[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-13477

_____

D. C. Docket No. 03-00227-CV-ORL-18-KRS

RAMON A. MERCADO,

Plaintiff-Appellant,

versus

CITY OF ORLANDO,  a municipal
corporation and political subdivision of the State
of Florida; RAMFIS PADILLA, Officer, individually
and as an agent and employee of the City of Orlando and
Orlando Police Department, and CHRISTINA ROUSE,
Officer, individually and as an agent and employee of the
City of Orlando and Orlando Police Department.

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 29, 2005)

Before MARCUS, FAY and SILER[*], Circuit Judges.

SILER, Circuit Judge:

Plaintiff Ramon A. Mercado appeals the grant of summary judgment in favor of the defendants City of Orlando ("Orlando"), and police officers Ramfis Padilla and Christina Rouse on his 42 U.S.C. § 1983 claims for the use of excessive force when detaining him and preventing him from committing suicide.[1] For the following reasons, we **REVERSE** and **REMAND** on the issue of qualified immunity with respect to Padilla and **AFFIRM** on all other issues.

## I.

In 2002, Mercado and his wife, Ibis, had a heated argument, during which Ibis told Mercado that she wanted to end their marriage and return to Puerto Rico without him. Mercado became despondent, began to cry, and tried to convince her

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] Mercado does not appeal the district court's grant of summary judgment to the defendants on his Fifth, Sixth, and Eighth Amendment claims. His appellate brief only challenges the district court rulings on the Fourth Amendment and negligence issues.

His alternative argument, that his Fourteenth Amendment rights were violated, is without merit because there is no question that Mercado was in custody at the time of the seizure. A suspect is in custody whenever an officer "restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)). Because the police surrounded Mercado and there was no way for him to escape, he was "seized" for the purposes of the Fourth Amendment. Even if Mercado was not seized at the point when he was surrounded by police, he was seized at the time he was struck by the projectile from the Sage Launcher. See Carr v. Tatangelo, 338 F.3d 1259, 1268 (11th Cir. 2003).

2

to stay, telling her that he would commit suicide if she left him. To demonstrate his intent, he wrapped a telephone cord around his neck and attached the other end to a ceiling vent. Mercado used a kitchen knife to make multiple cuts on his arms. He then grasped the knife with both hands and pointed it toward his heart.

Ibis called the Orlando Police Department and reported the attempted suicide, and officers were dispatched to her apartment. Rouse and Padilla were among those officers who arrived at Mercado's residence. Ibis told the officers that Mercado was armed with a knife and had threatened to commit suicide. The police attempted to make verbal contact with Mercado for twenty minutes from outside the apartment door. When this attempt was unsuccessful, the officers entered the apartment with Ibis's permission.

Inside, the officers found Mercado sitting on the kitchen floor, crying. He was holding the knife in both hands and pointing it toward his heart. The telephone cord was still wrapped around his neck, but there is no evidence that it was still wrapped around the ceiling vent. The officers identified themselves and ordered Mercado to drop his knife at least two times (once in English and once in Spanish), but he refused without making any threatening moves toward the officers. At no time did the officers warn Mercado that force would be used if he did not drop his weapon.

3

Fifteen to thirty seconds after giving that order, Padilla followed Rouse's orders to hit Mercado with the Sage SL6 Launcher ("Sage Launcher") and subdue him.[2] The Sage Launcher is a "less lethal" munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy–approximately the energy of a professionally-thrown baseball. The Sage Launcher was designed to be used to protect persons from self-inflicted injury, especially when using a night stick or baton would be unsafe or impractical. The projectile is not designed to penetrate the body, but only to leave bruises.

From a distance of approximately six feet, Padilla had a clear view and fired the Sage Launcher twice, hitting Mercado once in the head.[3] Padilla claims that he was aiming at Mercado's shoulder. The impact fractured Mercado's skull, resulting in brain injuries. He now takes medication to prevent seizures, and he suffers from a host of ailments including headaches, loss of memory, loss of balance, insomnia, dizziness, stuttering, loss of sensation and movement, loss of

[2]Although the officers claim that Mercado was "turning blue" from oxygen deprivation at the time that Padilla hit him with the Sage Launcher, another officer stated that he did not turn blue until after he was shot. Because this is a motion for summary judgment, we must view all evidence in the light most favorable to the non-moving party and assume that Mercado was not suffocating when the police entered his apartment.

[3]According to Mercado's deposition and medical evidence, he was only hit by one rubber baton, so the other shot must have missed Mercado entirely.

strength, and sensitivity to light. He is disabled and cannot work.

Padilla was trained on the acceptable uses of the Sage Launcher. He was also aware of Orlando Police Department policies concerning the weapon, specifically, that "[t]argeting the head or neck with the baton or Sage SL6 projectile is acceptable in deadly force situations only." Furthermore, the policy defines "deadly force" as "force that is likely to cause death or great bodily harm." The policies also provide that a crisis negotiation team shall be dispatched when a subject threatens to commit suicide, has the apparent ability to do so, and refuses to surrender.

Shortly after the incident, another officer tested Padilla's Sage Launcher for accuracy. The weapon was in proper working order and was accurate up to a distance of five yards. In her deposition, Rouse testified that the incident did not require deadly force; however, Padilla stated that the situation might have required such force. The defendants' expert testified that deadly force would not be appropriate under these facts and that he would not have purposely aimed the Sage Launcher at Mercado's head.

Mercado sued Padilla and Rouse in both their individual and official capacities, alleging that they used unreasonable force in detaining him, and thus violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments. He asserted a Monell claim against Orlando, claiming that the city has a policy of using excessive force against its citizens. He also asserted state-law claims against Orlando for negligence in training and supervising Padilla and Rouse.

Later, the defendants filed a motion in limine to prevent, inter alia, the introduction of a statement by Mercado's sister, Limarie Vargas, concerning a conversation with Officer Angel Burgos on the night of the incident. Burgos allegedly told Vargas that Orlando trains its officers to "shoot people in the head," not the body. The district court determined that the statement was inadmissible hearsay.

The district court granted summary judgment to the defendants, stating that the officers did not use excessive force against Mercado and were afforded qualified immunity. It also dismissed the Monell and negligence claims against Orlando for lack of evidentiary support.

## II.

We review the district court's grant of summary judgment de novo. Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

6

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. R. 56(c). When making this determination, we view all facts in the light most favorable to Mercado, the non-moving party. See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). Furthermore, we review the district court's grant of a motion in limine for abuse of discretion. Chrysler Intern. Corp. v. Chemaly, 280 F.3d 1358, 1362 (11th Cir. 2002).

## A. Mercado's Claim Against the Officers for Excessive Force[4]

Mercado can only state a claim under Fourth Amendment against Rouse and Padilla if the officers are not entitled to qualified immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Ferraro, 284 F.3d at 1193-94 (quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001)) (internal quotation marks omitted). Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, "protecting from suit all but the plainly incompetent or one who is knowingly

---

[4]Mercado also sued both officers in their official capacities. However, Mercado's opening brief to this court only addresses the issue of the officers' qualified immunity for acts done in their individual capacity. Because Mercado did not argue that the district court erred in granting summary judgment to the officers in their official capacities, this argument should be deemed waived. See Four Seasons Hotel and Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004).

violating the federal law." Id. at 1194 (citation and internal quotation marks omitted).

In order for the defendants to claim protection for qualified immunity, they must first demonstrate that they were engaged in a discretionary duty. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). Because the defendants were trying to apprehend a potentially suicidal subject, they were clearly engaged in a discretionary capacity. The burden, then, shifts to Mercado to show that qualified immunity is not appropriate by satisfying a two-part inquiry. Courson v. McMilliam, 939 F.2d 1479, 1487 (11th Cir. 1991). First, viewing the evidence in the light most favorable to him, he must show that the officers violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If such violation occurred, then we must determine if that right was clearly established at the time of the incident. Id.

**1. Whether the Officers Violated Mercado's Constitutional Rights**

The Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force during a criminal apprehension. Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In determining whether the officers' force was reasonable, we must determine "whether a reasonable officer would believe that this level of force is

8

necessary in the situation at hand." Ferraro, 284 F.3d at 1197 (citation omitted). Under Graham, courts should determine the "objective reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "governmental interest at stake." 490 U.S. at 396. In this case, the intrusion was severe. Mercado was hit in the head by a projectile fired from the Sage Launcher, causing serious brain injury. Although this weapon is classified as a "less lethal" munition, Orlando police regulations recognize that it can be used as a deadly weapon.

When determining the government's interest, we must consider factors that include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Furthermore, the reasonableness of a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

Because this situation does not involve a criminal arrest, our facts do not fit neatly within the Graham framework. Furthermore, because Florida does not recognize attempted suicide as a crime, Krischer v. McIver, 697 So. 2d 97, 100 (Fla. 1997), it is impossible for this court to measure the "severity of the crime at issue."

9

We must next consider the extent to which Mercado placed himself or others in danger. See Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004) (granting qualified immunity to officer who used deadly force on a suicidal victim who "posed an immediate threat of harm" to himself, the officer, and others). The defendants claim that the use of force is justified because suicidal subjects sometimes make erratic moves that can jeopardize the safety of the officers on the scene. See Bell v. Irwin, 321 F.3d 637, 639 (7th Cir. 2003) (noting that police were justified in using "less lethal" bean-bag rounds on the plaintiff who threatened to blow up his home by igniting propane and kerosene tanks outside his home).

However, viewing the facts in the light most favorable to Mercado, we can find no indication that he made any threatening moves toward the police. See Deorle v. Rutherford, 272 F.3d 1272, 1284-85 (9th Cir. 1991) (denying officers qualified immunity after deploying a projectile "bean bag" and taking out the eye of a subject who was relatively cooperative and not a threat to the officers or others). Even though he posed no threat to the police, he was a threat to himself, and Florida law recognizes a "compelling interest in preventing suicide." Krischer, 697 So. 2d at 103.

Furthermore, Mercado was not actively resisting arrest, and there is no

evidence that he struggled with the police.  See Fernandez v. Cooper City, 207 F. Supp. 2d 1371, 1377 (S.D. Fla. 2002) (holding that officers were afforded qualified immunity for using force to subdue an emotionally unstable person who was actively resisting arrest).  Arguably, Mercado did not have time to obey Padilla's order to drop the knife because Padilla discharged the Sage Laucher within seconds of making this request.

All of the factors articulated in Graham weigh in favor of Mercado.  Because he was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head, if Padilla aimed for Mercado's head, he used excessive force when apprehending Mercado.  At this point, we must assume that Padilla was aiming for Mercado's head based on the evidence that Padilla was trained to use the Sage Launcher, that the weapon accurately hit targets from distances up to five yards, and that Mercado suffered injuries to his head.  Padilla was aware that the Sage Launcher was a lethal force if he shot at a subject from close range.  The officers were also aware that alternative actions, such as utilizing a crisis negotiation team, were available means of resolving the situation.  This is especially true in light of the fact that Mercado had not made any threatening moves toward himself or the officers.

Thus, in the light most favorable to Mercado, Padilla violated his  Fourth

11

Amendment rights when he intentionally aimed at and shot Mercado in the head with the Sage Launcher. See Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998) (denying qualified immunity for police officers when the suspect did not commit a serious crime, pose a threat to the officers or others, or actively resist arrest).

We further conclude, however, that Officer Rouse did not violate Mercado's Fourth Amendment rights. Although Officer Rouse did not fire the Sage Launcher, Mercado contends that she should be held responsible under a theory of supervisory liability.

> [S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively the causal connection may be established when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights" or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous.

Cottone v. Jenne, 326 F. 3d 1352, 1360-61 (11th Cir. 2003) (citations and internal quotation marks omitted).

Officer Rouse was in another room during the incident, and did not see Padilla aim or fire the gun. She did not tell Padilla to fire the Sage Launcher at Mercado's head. Given that Padilla was trained in the proper use of the launcher, that the Department's guidelines prohibited firing the launcher at a suspect's head or neck except in deadly force situations, and that (as explained below) there is no evidence that Padilla has used similarly excessive force in the past–all of which are undisputed facts in the record–Rouse could not reasonably have anticipated that Padilla was likely to shoot Mercado in the head either intentionally or unintentionally. Even under the "failure to stop" standard for supervisory liability, Rouse cannot be held liable.

## 2. Whether Padilla Violated Clearly Established Law.

Even though Padilla violated Mercado's constitutional rights, he could still be afforded qualified immunity provided that Mercado's rights were not clearly established at the time of the incident. Mercado can demonstrate that his right was clearly established in a number of ways. First, he can show that a materially similar case has already been decided, giving notice to the police. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). He could also show that a broader, clearly established principle should control the novel facts in this situation. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L.

13

Ed. 2d 666 (2002). Finally, he could show that this case fits within the exception of conduct which so obviously violates that constitution that prior case law is unnecessary. Ferraro, 284 F.3d at 1199. To make this showing, Mercado must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida. See Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir. 2003).

Any case law that is "materially similar" to the facts in the case at hand must pre-date the officer's alleged improper conduct and "truly compel the conclusion that the plaintiff had a right under federal law." Ensley v. Soper, 142 F.3d 1402, 1406 (11th Cir. 1998) (internal quotation and citation omitted). Mercado, however, can point to no controlling case law from the Supreme Court or this Circuit dealing with the Sage Launcher. Although there are some cases dealing with "less lethal" weapons, such as pepper spray, none of them is "materially similar" to the facts in this case or "truly compels" the conclusion that Mercado had a right established under federal law. See, e.g., Vinyard v. Wilson, 311 F.3d 1340, 1349 (11th Cir. 2002) (denying qualified immunity to an officer who sprayed pepper in the eyes of an arrestee who was already handcuffed).[5]

---

[5]The case of Wood v. City of Lakeland, 203 F.3d 1288 (11th Cir. 2000), contains the clearest factual similarities to the case at bar. In Wood, the plaintiff's family called the police to subdue a suicidal subject. Id. at 1290. When the officers entered the residence, they observed him sitting on a dresser, with his blood-covered arms holding an object to his neck. Id. After repeatedly refusing to drop his weapon, he slid off the dresser, prompting an officer to shoot

14

If there is no case law directly on point, "[g]eneral statements of the law contained within the Constitution, statute, or caselaw may sometimes provide 'fair warning' of unlawful conduct." Willingham, 321 F.3d at 1301. These principles may give notice to officers, provided that the decisions clearly apply to the situation at hand. The "reasoning, though not the holding" of prior cases can also send "the same message to reasonable officers" in novel factual situations. Hope, 536 U.S. at 743.

The general principle of law must be specific enough to give the officers notice of the clearly established right. Indeed, the principle that officers may not use excessive force to apprehend a suspect is too broad a concept to give officers notice of unacceptable conduct. See Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (noting that although the unconstitutionality of using excessive force is an established principle, the concept is far too broad).

Mercado, however, relies on the principle that deadly force cannot be employed in a situation that requires less-than-lethal force. See Tennessee v. Garner, 471 U.S. at 11-12 (holding that a police officer cannot "seize an unarmed

---

him. The officers were entitled to qualified immunity because they "made a reasonable split-second judgment call, in light of [his] volatile, emotional, and aggressive state, to use deadly force in order to prevent imminent death or great bodily harm to himself or another." Id. at 1293. Wood has since been called into question by Holloman because the Wood court was too restrictive in its analysis. Because there is no way to discern how the Wood court would have decided that case under the correct legal analysis, its relevance is marginal.

15

nondangerous suspect by shooting him dead"). Because the Fourth Amendment protects citizens from "unreasonable" seizures, the use of deadly force must be reasonable under the circumstances. Vaughan v. Cox, 343 F.3d 1323, 1329 (11th Cir. 2003). Using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment.

Under Florida law, "deadly force" means any "force that is likely to cause death or great bodily harm," but does not include "the discharge of a firearm by a law enforcement officer or correctional officer during and within the scope of his or her official duties which is loaded with a 'less lethal munition.'" Fla. Stat. § 776.06. "Less-lethal munition" is, in turn, defined as "a projectile that is designed to stun, temporarily incapacitate, or cause temporary discomfort to a person without penetrating the person's body." Id. According to Orlando policies, the Sage Launcher is defined as a "less lethal" munition; however, they also recognize that some uses of the weapon should only be employed in deadly force situations. Shooting a suspect in the head is specifically forbidden unless the situation requires deadly force.

As noted above, for the purposes of summary judgment, we must assume that Padilla intended to shoot Mercado in the head based on Mercado's injuries and the proven accuracy of Padilla's weapon. Because shooting a subject in the head

16

with a Sage Launcher employs force "likely to cause death or great bodily harm," this action can be considered "deadly force." Both Padilla and Rouse were aware that police policy forbade them from utilizing this magnitude of force under the facts at bar. Because this situation was clearly not a deadly force situation, and because the officers utilized deadly force to subdue Mercado, they violated the clearly established principle that deadly force cannot be used in non-deadly situations.

Furthermore, this is one of the cases that lie "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." Ferraro, 284 F.3d at1199 (internal quotation and citation omitted). The facts in this case are also "so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." Willingham, 321 F.3d at 1303.

We have repeatedly held that police officers cannot use force that is "wholly unnecessary to any legitimate law enforcement purpose." Ferraro, 284 F.3d at 1199 (holding that slamming a handcuffed arrestee's head against a vehicle violated the Fourth Amendment); see Slicker v. Jackson, 215 F.3d 1225, 1227 (11th Cir. 2002) (denying qualified immunity for an officer who kicked an arrestee

17

already in handcuffs); <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 926-27 (11th Cir. 2000) (denying qualified immunity to officers who allowed a police dog to attack an arrestee who was already on the ground).

Officer Padilla should not have needed case law to know that by intentionally shooting Mercado in the head, he was violating Mercado's Fourth Amendment rights. When the officers entered the apartment, they found Mercado crying on the floor of his kitchen with a loose cord around his neck and a kitchen knife placed up to, but not poking into, his chest. From a distance of about six feet away, Padilla twice shouted for Mercado to drop his knife, and then discharged the Sage Launcher, hitting Mercado in the head from short range. Assuming that Padilla was aiming at Mercado's head intentionally, his use of force was clearly excessive.

There is sufficient evidence in the record to support a finding that Padilla intentionally aimed for Mercado's head. First Padilla had been trained in the use of the Sage Launcher. Second, the defendants' witness testified that the Sage Launcher fired accurately from a distance of up to five yards. Third, Padilla fired from a distance of six feet. Finally, the only shot that made contact with Mercado hit him in the head. Since such circumstantial evidence could lead a reasonable jury to find that Padilla intended to hit Mercado in the head, we **REVERSE** the

18

district court's ruling as to Padilla and find that he should not be afforded the protection of qualified immunity.

**B. Mercado's Fourth Amendment Claim Against Orlando**

Under Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), municipalities are subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury[.]" Id. at 694. Furthermore, municipalities cannot be held liable for employees under respondeat superior. Samples v. City of Atlanta, 846 F.2d 1328, 1333 (11th Cir. 1988).

For Mercado's Monell claim to survive summary judgment, he must bring forth some evidence of a pattern of improper training to sustain his claim, and he must show that Orlando was aware of the deficiencies in the program. See City of Canton v. Harris, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (noting that constitutional policies can become unconstitutionally applied through a repeated failure to train); see also Riley v. Newton, 94 F.3d 632, 638 (11th Cir. 1996). Furthermore, Mercado must show that this training or failure to train amounted to "deliberate indifference" on the part of the Orlando. See City of Canton, 489 U.S. at 389; see also Gold v. City of Miami, 151 F.3d 1346, 1350

(11th Cir. 1998) (noting that there are only "limited circumstances in which an allegation of a failure to train or supervise can be the basis for liability under § 1983") (internal quotation marks omitted).

Both of Mercado's arguments regarding his <u>Monell</u> claim challenge the district court's rulings on the defendants' motion in limine to exclude evidence from trial. Mercado first claims that the court erred in determining that Officer Burgos's statement, which would have been introduced through Mercado's sister, that officers are trained to "shoot people in the head," is inadmissible hearsay and more prejudicial than probative. The district court, however, did not abuse its discretion when it determined that the statement was hearsay.

Rule 801(d)(2)(D) states that a non-hearsay party admission includes a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Although the statement may meet all of these requirements, the Rule further provides that "the contents of the statement shall be considered but are not alone sufficient to establish the agency or employment relationship and scope thereof under subdivision (D)." The only evidence Mercado has produced relating to Burgos's statement is the uncorroborated statement itself. Because Mercado has not brought forth any evidence to corroborate this statement, the district court did

20

not abuse its discretion in finding that the statement is inadmissible hearsay.

Mercado also argues that the district court erred in precluding him from introducing into evidence other instances of Orlando officers using excessive force. In Gold, we determined that a plaintiff could not establish a Monell claim when he could not point to any other incidents involving similar facts. 151 F.3d at 1351. Mercado, too, cannot meet this burden. During discovery, he was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are substantially similar to the case at hand. For this reason, the district court did not abuse its discretion, and the dismissal of Mercado's Monell claim against Orlando should be **AFFIRMED**.

## C. Mercado's Negligence Claims Against Orlando

Finally, Mercado alleged that Orlando was negligent in training and supervising its employees, and Orlando defends on the grounds of sovereign immunity. Although Florida Statute § 768.28(1) waives sovereign immunity for acts which would create liability for a private person, such waiver extends only to the government's "operational," not "discretionary" acts. Lewis v. City of St. Petersburg, 260 F.3d 1260, 1262 (11th Cir. 2001).[6] Even though the officers had a

---

[6]This court must first determine if the claims that Mercado is alleging against Orlando would be actionable against a private person. The torts of negligent supervision and negligent training are recognized in Florida, and no party contends otherwise.

duty of care with respect to Mercado because he was in custody, <u>Moore v. State</u>, 861 So. 2d 1251, 1253 (Fla. Dist. Ct. App. 2003), he must show that the training and supervision of the defendant officers constituted an operational duty before it can seek to recover any damages.

### 1. Negligent Training

For Mercado to state a claim for negligent training, he must show that Orlando was negligent in the implementation or operation of the training program. He cannot merely challenge the content of the program. The determination of the content of a training program is a discretionary function for the city which is afforded sovereign immunity. <u>Lewis</u>, 260 F.3d at 1266. Because Mercado only challenges the content of the program, not the way in which the program was implemented, Orlando is entitled to sovereign immunity with respect to this claim.

### 2. Negligent Supervision

The Florida Supreme Court recognized the tort of negligent retention as early as 1954, stating that the employer cannot knowingly keep "a dangerous servant on the premises which defendant knew or should have known was dangerous and incompetent[.]" <u>Mallory v. O'Neil</u>, 69 So. 2d 313, 315 (Fla. 1954). To state a claim of negligent retention of employees, Mercado must show that Orlando was put on notice of the "harmful propensities of the employees." <u>Willis</u>

22

v. Dade County Sch. Bd., 411 So. 2d 245, 246 n.1 (Fla. Dist. Ct. App. 1982). Because Mercado has not brought forth any evidence that Orlando had notice that either of the officers had "harmful propensities" or was otherwise unfit to serve as a police officer, he cannot state a claim for negligent supervision. For these reasons, we **AFFIRM** the district court's rulings as to Mercado's claims for both negligent training and negligent supervision.

**AFFIRMED** in part and **REVERSED** and **REMANDED** in part.