[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13301
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-21069-FAM

DAVID CALDERIN,

Plaintiff - Appellee,

versus

MIAMI-DADE POLICE DEPARTMENT,
J.D. Patterson in his official capacity as Director, et al.,

Defendants,

ERIC H. SCHOTTENHEIMER,
individually and in his official capacity as an
officer of the Miami-Dade Police Department,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 5, 2015)

Before MARCUS, WILSON and WILLIAM PRYOR, Circuit Judges.

PER CURIAM:

This appeal arises from a 42 U.S.C. § 1983 action brought by David Calderin against Officer Erik Schottenheimer of the Miami-Dade Police Department (MDPD).  Officer Schottenheimer appeals the district court's denial of his motion for summary judgment based on qualified immunity.  Because Officer Schottenheimer's use of force violated Calderin's clearly established Fourth Amendment right to be free from unreasonable seizures, we affirm.

I.

On December 29, 2011, Calderin texted a former girlfriend, Anam Aziz (Anam) to tell her that he was going to speak with her father, Hussein Aziz (Hussein), at the car dealership where he worked.  Calderin also told Anam, via text message, that he would kill himself if she called the police.  Anam called the police and notified them of the messages she received from Calderin, including his threat to commit suicide.

As promised, Calderin went to the car dealership where Hussein worked, carrying a thirteen-inch knife in his pocket.  According to Calderin, he brought the knife with him because he believed that he would be taken in for psychiatric treatment, rather than arrested, if police discovered the knife.

2

After Anam's 911 call, police dispatch sent MDPD Officer Nery de Leon Lowry to the dealership.  Officer Lowry reported that, when she arrived, Calderin appeared sad, disappointed, and hopeless.  Hussein was apparently in the process of telling Calderin that his relationship with Anam was over and that Anam would be getting married in a matter of months.  Calderin and Hussein finished their conversation with a hug when Officer Lowry arrived.  Meanwhile, Officer Schottenheimer was patrolling the area and heard a request for backup to the dealership over the radio.  He also learned via radio that Anam had told the 911 dispatcher that Calderin threatened to commit suicide.  Officer Schottenheimer appeared on the scene approximately when Hussein and Calderin were wrapping up their conversation and while Officer Lowry was approaching the pair.  Officer Schottenheimer reported that none of the individuals present seemed to be exhibiting any emotions.

Officer Lowry asked Calderin whether he was, in fact, David Calderin. When Calderin responded affirmatively, Officer Lowry asked whether he had any weapons.  Calderin told Officer Lowry that he had a knife in his pocket.  Officer Lowry announced that Calderin had a knife "very loudly."  Officer Lowry ordered Calderin to raise his hands above his head and placed her hand on her Taser. Calderin instead reached for and grabbed the knife, which was sheathed and in his pants pocket.  He loudly announced that he had a knife and raised the knife toward

his own neck.  Three seconds after taking the knife from his pocket, he was shot in the arm by Officer Schottenheimer.  At that time, Calderin estimates that he was ten to twelve feet from Officer Lowry and thirty feet from Officer Schottenheimer. Officer Schottenheimer estimates these distances at seven to eight feet and fifteen to eighteen feet, respectively.  Calderin dropped the knife immediately when he was shot.[1]  Calderin never removed the knife from its sheath.  Officer Schottenheimer claims that he never heard Officer Lowry or Calderin say that Calderin had a knife.  Officer Schottenheimer also claims that he thought the knife was a revolver, specifically that the knife's handle looked like the grip of a revolver.

Immediately after getting shot in the arm, Calderin turned his back on the officers and began to run from them.  He did not attempt to reach for the knife again.  Officer Schottenheimer shot him four additional times.  Officer Schottenheimer claims to have seen the knife fall to the ground only after firing his final shot.

During Calderin's raising of the knife and Officer Schottenheimer's shots, no individuals besides Calderin and the two officers were present, though Officer Schottenheimer claims that Hussein was still in the vicinity and was standing close to Calderin.  Calderin claims not to have heard any warning from Officer

---

[1] Calderin's expert witness testified in a deposition that it would be impossible for Calderin to continue to hold onto the knife after being shot in the same arm that held the knife.

4

Schottenheimer prior to his discharging his weapon.  Officer Schottenheimer insists that he warned Calderin twice to get on the ground.  Officer Schottenheimer did not warn Calderin that he would shoot.  Officer Lowry testified that Calderin seemed more compliant when she was the only officer on the scene.  While he was on the ground after the shooting, Calderin heard Officer Lowry admonishing Officer Schottenheimer that he did not have to shoot Calderin because she had just finished telling him that Calderin had a knife.  Moreover, Officer Lowry never drew her gun.  MDPD classified Calderin's criminal conduct as misdemeanor carrying of a concealed weapon.

## II.

We review the denial of summary judgment based on qualified immunity de novo.  *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We view the evidence and draw inferences in a light most favorable to the nonmoving party.  *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).  In § 1983 cases where the defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating that defendant violated a constitutional right and that that right was clearly established when the violation occurred.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005).

5

A.

Calderin argues that Officer Schottenheimer violated his right to be free from unreasonable seizures when Officer Schottenheimer shot him. *See* U.S. Const. amend. IV. Calderin maintains that all of the shots that hit him violated that right. Officer Schottenheimer counters that his discharging of his weapon was reasonable under the circumstances. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (recognizing that police are entitled to use a reasonable amount of force—judged under the circumstances—in carrying out their duties). When considering the reasonableness of a seizure, we "balanc[e] the 'nature and quality of the intrusion' against the 'governmental interest at stake.'" *Mercado*, 407 F.3d at 1157 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989) (internal quotation marks omitted)). "When determining the government's interest, we must consider factors that include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872).

Preliminarily, we must address Officer Schottenheimer's assertions regarding his perception of the circumstances surrounding the shooting: (1) that he believed that Calderin was holding a gun and not a knife; (2) that he did not see Calderin drop the knife after the first shot; and (3) that he believed Hussein to have

6

remained in the area after his arrival.  Officer Schottenheimer's reasonable beliefs about the circumstances surrounding the shooting are relevant to the reasonableness of his actions.  *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("We then ask not whether probable cause existed but whether the officer reasonably believed it existed, based upon the information he or she possessed at the time of the incident.").  However, applying the summary judgment requirement that we view the facts in the light most favorable to the nonmoving party, and remaining mindful that a factfinder is entitled to disbelieve the defendant, *see Acoff v. Abston*, 762 F.2d 1543, 1548 (11th Cir. 1985), we must assume that Officer Schottenheimer knew the facts as Calderin sets them out.  In other words, we assume that Officer Schottenheimer knew that Calderin was holding a knife, that Calderin dropped the knife after the first shot, and that Hussein was no longer in the vicinity.

Thus, the situation can be summarized as follows.  Officer Schottenheimer arrived at the dealership, where he saw Calderin, whom he knew was suicidal.  Calderin drew the knife, bringing it close to his own chest or neck area.  Officer Lowry and Calderin both announced that Calderin had a knife, with Calderin making his announcement while he held the knife, and Officer Schottenheimer heard them.  The only other individual in the vicinity was Officer Lowry, who was ten to twelve feet away.  Officer Schottenheimer was thirty feet away.  Calderin

did not make any threatening movements. Officer Schottenheimer resorted to lethal force to disarm Calderin without giving Calderin any warning. Immediately after the first shot, Calderin dropped the knife, which Officer Schottenheimer saw. Calderin turned to escape the gunfire, and Officer Schottenheimer continued to shoot, even though he knew that Calderin had dropped the knife.

Under the *Mercado*/*Graham* balancing test, the nature and quality of the intrusion here is extremely severe. *See Tennessee v. Garner*, 471 U.S. 1, 9, 105 S. Ct. 1694, 1700 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched.").

Considering the governmental interest side of the balancing test, first, the crime at issue was not severe; MDPD eventually categorized it as a misdemeanor. *See Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) ("[W]e note that the crimes with which Galvez was charged were not severe; petit theft and resisting arrest without violence are both misdemeanors . . . .").

Calderin also did not pose a threat to the safety of the officers or others. *Mercado* provides us with precedent with strikingly similar facts where we held that there was little to no safety issue and eventually ruled in the plaintiff's favor. There, the plaintiff threatened to attempt suicide by hanging after a fight with his wife. 407 F.3d at 1154. The wife called 911 and reported that her husband was suicidal. *Id.* When two police officers entered the home, the plaintiff was sitting

8

on the floor, crying, and pointing the knife at his heart. *Id.* The officers ordered the plaintiff to drop the knife, but he refused. *Id.* The plaintiff never made threatening moves toward the officers. *Id.* The officers did not warn the plaintiff that they would use force if he did not drop the weapon. *Id.* Fifteen to thirty seconds later, one officer ordered the other to fire a non-lethal round at the plaintiff, which he did. *Id.* at 1154–55. The police department's policies allowed targeting of the head or neck with the non-lethal round only in situations where deadly force—i.e., force likely to cause death or serious bodily harm—would be justified. *Id.* at 1155.

"The defendants claim[ed] that the use of force [was] justified because suicidal subjects sometimes make erratic moves that can jeopardize the safety of the officers on the scene." *Id.* at 1157. We concluded that the plaintiff was not "posing an immediate threat to the officers at the time he was shot in the head" largely because there was "no indication that [the plaintiff] made any threatening moves toward the police." *Id.* at 1157–58. Likewise, speculation about erratic moves Calderin may have made or other weapons he may have had on his person are insufficient to justify the force applied here when Calderin was merely holding the knife. Moreover, we find it relevant to the inquiry of how a reasonable officer would react to the situation that Officer Lowry never felt the need to draw her

9

firearm, even though she was closer to Calderin, and admonished Officer Schottenheimer for shooting Calderin.

Finally, whether Calderin was resisting or evading arrest also fits nicely into the analysis contained in *Mercado*. In *Mercado*, as is the case here, the plaintiff failed to comply with instructions from the officers. *Id.* at 1157. In some ways, failing to comply with officer instructions may be considered resisting arrest or at least akin to it. Nonetheless, we held that the plaintiff "was not actively resisting arrest" and noted the fact that he did not struggle with the officers. *Id.* Similarly, here, we cannot say that Calderin was resisting arrest, even though he was not complying with officer instructions.

With two of the governmental interest factors weighing heavily against Officer Schottenheimer and another barely, if at all, weighing in his favor, the balance between the intrusion and the governmental interest tips the scale against Officer Schottenheimer. His initial firing of his weapon was an unreasonable use of force under the circumstances. The same can be said of the subsequent shots fired during Calderin's flight because, taking the facts in the light most favorable to Calderin, Officer Schottenheimer knew that Calderin was unarmed after the first shot and did not pose a threat of immediate harm to others. *See Garner*, 471 U.S. at 3, 105 S. Ct. at 1697 (holding that the use of deadly force against a fleeing suspect is unreasonable unless "the officer has probable cause to believe that the

10

suspect poses a significant threat of death or serious physical injury to the officer or others"). Therefore, Officer Schottenheimer violated Calderin's constitutional right to be free from unreasonable seizures.

## B.

We must now determine whether the right Officer Schottenheimer violated was clearly established. A right is clearly established where there exists "a materially similar case that has already decided that what the police officer was doing was unlawful." *Durruthy v. Pastor*, 351 F.3d 1080, 1092 (11th Cir. 2003) (internal quotation marks omitted). We have already discussed *Mercado*, which we decided approximately six years before the shooting here. The facts of that case were sufficiently similar to put Officer Schottenheimer on notice that his conduct would violate Calderin's constitutional right. In fact, *Mercado* is nearly indistinguishable on the material facts. Calderin's right, then, was clearly established when Officer Schottenheimer violated it.

**AFFIRMED.**