[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14295
_____

D.C. Docket No. 8:14-cv-01940-MSS-AEP

JASON C. TURK,
AMANDA TURK,

                                        Plaintiffs - Appellants,

versus

TIMOTHY J. BERGMAN, Officer,
individually,
CITY OF TAMPA,

                                        Defendants - Appellees.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 14, 2017)

Before TJOFLAT, HULL, and O'MALLEY,[*] Circuit Judges.

HULL, Circuit Judge:

The plaintiffs, Jason and Amanda Turk, appeal the district court's grant of summary judgment in favor of the defendants, Officer Timothy Bergman, individually, and the City of Tampa. After review of the record and with the benefit of oral argument, we reverse.

The Turks sued Officer Bergman and the City of Tampa for use of excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Counts I and IV), state law battery (Counts II and III), and loss of consortium, against Bergman only (Count V). The district court granted summary judgment on all counts, finding that Bergman acted reasonably when he shot Mr. Turk in the face twice and thus did not violate Mr. Turk's constitutional rights.

Because the district court concluded there was no constitutional violation at all, the district court did not rule on the other grounds asserted by the City of Tampa's motion for summary judgment on the plaintiffs' § 1983 failure to train and discipline claims against it in Count IV, such as: (1) there were no substantially similar prior incidents indicating a need for better training in mental health crisis intervention that would demonstrate deliberate indifference; (2) no evidence demonstrated a failure of the City of Tampa to discipline officers; and

---

[*]Honorable Kathleen M. O'Malley, United States Circuit Judge for the Federal Circuit, sitting by designation.

(3) the City of Tampa provided adequate crisis intervention training.[1] The district court also did not rule on Officer Bergman and the City of Tampa's defense of statutory immunity to the state law battery claims in Counts II and III.

Based on the record before us, we conclude that the district court erred in granting summary judgment on the constitutional violation issue.[2] The record demonstrates massive disputes of material fact that preclude granting summary judgment on that Fourth Amendment ground. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Viewing the facts in the light most favorable to the Turks, the evidence shows that jury issues exist as to whether Mr. Turk posed an immediate threat of serious bodily harm to the officers, which was required for Officer Bergman to use deadly force.

Sometime around 2:00 a.m. on January 9, 2014, Officer Bergman, along with several other police officers, responded to a 911 call and was told that Mr. Turk was contemplating suicide and might try to have the police kill him. Despite

---

[1]The § 1983 claim against the City of Tampa did not rely on a respondeat superior theory. Instead, the Turks alleged that the City of Tampa acted with deliberate indifference by failing to train its officers on mental health crisis intervention.

[2]We review an order granting summary judgment de novo, viewing the facts of the case in the light most favorable to the party opposing the motion. Vinyard v. Wilson, 311 F.3d 1340, 1346 n.7 (11th Cir. 2002). We therefore recite the facts in the light most favorable to the plaintiffs, even though the defendants dispute the plaintiffs' version of the events. Id. at 1343 n.1.

this warning, there was no evidence that Mr. Turk was a suspect of a crime or a threat to his family that night.  Upon arrival, the police officers found Mr. Turk sitting in his BMW.  Mr. Turk was sitting in the driver's seat and had a gun lying in the passenger's seat.

Mr. Turk heard "a startling voice" say "show us your gun."  It was the only command Turk heard anyone give, and at that time Mr. Turk did not know who was speaking or that the police officers were there.[3]  Thus startled, Mr. Turk grabbed his gun with his right hand, while still holding his cell phone in his left.  Under Mr. Turk's version of events, at no point did Mr. Turk raise the gun from his lap or point it at anyone or make any threatening moves.

Instead, still seated, Mr. Turk turned his head around and saw several police officers behind him through the rear window of the car.  Now realizing the police officers were there, Mr. Turk put the gun in his lap and moved his right hand to the BMW's center console, where the window controls were located.

Mr. Turk rolled down the rear passenger window about halfway and yelled "What for? What's the point?"  After responding, Mr. Turk started to turn his head

---

[3]Even the officers dispute what was said and by whom.  Officer Christopher Laframboise testified that he and others loudly commanded Mr. Turk: "Let me see your hands" and "Show me your hands."  Officer Bergman, however, testified that he asked Mr. Turk to put the gun down, saying: "hey, Mr. Turk, I am Officer Bergman with Tampa Police Department. . . . [W]hat I need you to do is, just put the gun down. . . . [L]et's talk about this."  In his affidavit, Bergman denies ever saying "show me your gun" because he "would never ask a person to take a gun and make it more readily available to shoot [him]."  Officer Carlos Rodriguez claimed he heard commands to "drop the gun" from Bergman and other officers.

back towards the front and felt a bullet enter his right cheek and come out the left side of his throat.  Officer Bergman had fired a volley of shots and had shot Mr. Turk.[4]  At some unknown point, Mr. Turk's gun fell from his lap to the car's floorboard.

Mr. Turk recognized that he had been shot and heard the officers "asking if anyone saw a gun," to which they responded "no."  Mr. Turk then picked up his cell phone with both hands and took a picture of himself.  About one minute later, Officer Bergman shot Mr. Turk a second time, with the bullet entering roughly the same spot.

Based on the facts viewed in the light most favorable to the plaintiffs, Mr. Turk stayed seated in the BMW and only briefly held his gun in his hand, when he first heard the officers, and did not touch it again.  Indeed, at the time Mr. Turk was first shot, Mr. Turk's gun was in his lap.  Mr. Turk insists that he never raised the gun up at all and the evidence showed that the gun fell from his lap to in between the seats.  If Turk is believed, he never posed a threat to the officers or anyone else.

In addition, the numerous and material inconsistencies in Officer Bergman's own statements about the events of that night raise serious concerns about the

---

[4]Officer Bergman testified that, before he shot, Mr. Turk had been talking to him and looking at him and then Mr. Turk leaned back over his right shoulder and raised the gun backwards towards Bergman.  Mr. Turk expressly denies this.

credibility of any of his testimony. For instance, Bergman provided inconsistent statements about when he first shot Mr. Turk. In a January 9, 2014 Internal Affairs interview, Bergman claimed that Mr. Turk raised the gun up and that he could not tell where the muzzle or the barrel was pointing. But then Bergman twice contradicted this. Specifically, in an April 23, 2014 interview, Bergman stated that the muzzle was facing back towards him, and in his later deposition, Bergman insisted that the muzzle was coming back in his direction.

In another example, Bergman told conflicting stories about what he saw after he first shot Mr. Turk. In his deposition, Bergman claimed that he saw Mr. Turk had dropped the gun into his lap and was holding his cell phone in his right hand. In his affidavit, Bergman averred that Mr. Turk was still holding the gun and that he did not see Mr. Turk had a cell phone until after shooting him the second time. In his January 2014 interview, Bergman also claimed that everybody else yelled "gun" before he shot Mr. Turk the second time. Yet in his later deposition, Bergman stated that he did not hear anyone else yell "gun" before he shot Mr. Turk the second time.

When viewing the facts in the light most favorable to the plaintiffs, Mr. Turk was sitting in his BMW with a gun in his lap that was never raised up, pointed, or even touched at the time of the shootings.

6

In addition, Mr. Turk made no threatening moves towards the police.  See

Mercado v. City of Orlando, 407 F.3d 1152, 1154, 1158 (11th Cir. 2005) (finding a

Fourth Amendment violation when a person attempting suicide and holding a knife

ignored two commands to drop the knife but made no threatening moves).  A jury

could believe that Mr. Turk did nothing to threaten the officers and that the officers

shot without provocation.  See Lundgren v. McDaniel, 814 F.2d 600, 603 (11th

Cir. 1987) (finding that a jury could have reasonably believed the officers were

never threatened by a weapon and acted without provocation when whether "the

decedent stood up behind the desk, threatened the officers with a weapon, or fired

a shot, were . . . sharply contested").  Importantly too, Mr. Turk was not

committing a crime, resisting arrest, or even suspected of committing a crime.  See

Mercado, 407 F.3d at 1157 (stating that "[b]ecause this situation does not involve a

criminal arrest, our facts do not fit neatly within the Graham framework"[5] and

"because Florida does not recognize attempted suicide as a crime, it is impossible

for this court to measure the 'severity of the crime at issue'" (citation omitted)).

Accordingly, we cannot say that a police officer in Officer Bergman's

position would reasonably perceive Mr. Turk, a non-suspect sitting in the BMW, as

posing an imminent threat of serious physical harm to the police officers on scene.

See Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1871-72 (1989)

---

[5]See Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1871-72 (1989).

7

(setting forth the objective-reasonableness test for the use of excessive force); Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005) (same).

Furthermore, as of January 9, 2014, the law was clearly established that a police officer may not use deadly force without warning against a person who was not committing a crime, resisting arrest, holding a weapon, or making any threatening moves. See Lundgren, 814 F.2d at 603 (concluding that police officers violated the Fourth Amendment when they "were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather . . . without provocation shot at a nondangerous suspect"); Mercado, 407 F.3d at 1157-58 (concluding that a police officer violated the Fourth Amendment when he intentionally aimed at and shot the plaintiff in the head "especially . . . in light of the fact that [the subject] had not made any threatening moves").[6]

Accordingly, we must reverse the district court's grant of summary judgment on all counts and remand for further proceedings. On remand the district

---

[6]There are more recent decisions not extant at the time of this 2014 shooting and thus inapplicable here because we examine clearly established federal law at the time of the shooting. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002). Those cases, however, are consistent with our holding here. See Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1326-27 (11th Cir. 2015) (finding allegations were sufficient to support an excessive force claim when two police officers found a young man with a mental health issue "sitting on a bed and looking down at a shotgun that lay loosely in his lap" and then shot him twice, then tasered him, and then beat him even though "[a]t no point did [the subject] ever raise the shotgun from his lap or point it in the direction of the Deputies" (internal quotation marks omitted)); see also Perez v. Suszczynski, 809 F.3d 1213, 1222 (11th Cir. 2016) (explaining that Eleventh Circuit "case law clearly establishes that the use of force against an arrestee who, inter alia, is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive").

court in the first instance should consider the other defenses raised by Officer

Bergman and the City of Tampa but not ruled on in the first summary judgment

order.

**REVERSED AND REMANDED.**