[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12150
Non-Argument Calendar

_____

D.C. Docket No. 9:17-cv-80824-DMM

DAYNA CHRISTINE CLAWSON,
as Personal Representative of the Estate of
Ricky Kevin Whidden,

Plaintiff - Appellee,

versus

JUSTIN RIGNEY,
in his Individual Capacity,

Defendant - Appellant,

PALM BEACH COUNTY SHERIFF'S OFFICE,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 13, 2019)

Before MARCUS, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Justin Rigney, a Sheriff's Deputy with the Palm Beach County Sheriff's Office, appeals the denial of his motion for summary judgment on the basis of qualified immunity in this § 1983 action. Deputy Rigney was one of a number of deputies who responded to a call for service on December 31, 2016, after Ricky Whidden armed himself with a knife and threatened suicide. During the law enforcement encounter that followed, Rigney shot Whidden eight times, resulting in his death. Dayna Clawson, the personal representative of Whidden's estate, brought excessive force and wrongful death claims against Rigney and the Sheriff's Office. The district court denied Rigney's motion for summary judgment because, making all factual inferences in the opposing party's favor, it found that Rigney violated Whidden's clearly established right to be free from unreasonable seizure, a determination that Rigney has appealed on an interlocutory basis. After careful review, we affirm.

I.

The facts in the summary judgment record are these. At 1:05 a.m. on December 31, 2016, Sandra Whidden called 911 to report that her son, Ricky Whidden, was threatening to commit suicide. She told the dispatcher with the Palm Beach County Sheriff's Office that her son was armed with a knife and that

he had a history of mental illness.  Sandra said that they had opened the back door of the house for the deputies to use if they needed to enter, because Ricky was waiting for officers "to come through the front door so he can either harm you guys or harm himself."  Ricky Whidden could be heard in the background of the call apologizing to his parents and stating that he would never harm them or anyone else.

Seven Palm Beach County officers were sent to the Whiddens' residence. When Rigney arrived, Ricky Whidden was seated outside in front of the home. Five officers approached him in a "stick" formation, that is, in a single-file line, led by Deputy Adam Godbey holding a ballistic shield.  Deputy Rigney was last in line, leading a police dog.  Rigney called out to Whidden, saying, "We want to talk to you, but this conversation cannot continue until I see your hands are empty and I know you're not armed."  Whidden complied, raising his empty hands.  However, it appeared to Rigney that Whidden had tucked something into his waist area. Because Whidden was seated and wearing a jacket, the deputies could not be sure whether Whidden was armed, and some thought he had a knife somewhere on him.

As the officers approached him, Whidden began to walk away toward a neighboring lot to the east.  Rigney broke off from the group to stay near the Whidden's home, while four deputies continued to follow Whidden as he walked over a hedge at the boundary of the Whiddens' property.  As Whidden walked, he

3

spoke to the deputies and occasionally turned around to face them while walking backward, only revealing one hand at a time. Two video cameras from the neighbor's property, one facing the driveway and the other placed inside a screened-in patio, captured the following events. Whidden sped up and began to run, when Deputy Easterday fired a "less-lethal" 40-millimeter firearm in his direction. Rigney later said that these shots "caught [him] off guard," and he did not think that the use of the 40-millimeter weapon was justified. The less-lethal sponge round struck Whidden in the back and he fell to the ground. Whidden regained his footing and started running north away from the group of deputies, along the neighbor's side of the hedge. He fell a second time and again got up and continued running north.

Rigney, on the Whidden side of the hedge, was walking south toward Whidden and the other officers when the less-lethal round was fired. After Whidden got up and started running in a northerly direction away from the officers, Rigney ran generally in Whidden's direction and aimed his firearm in a southeastern direction. It is clear from the video that Whidden is running away from several officers, but Rigney's location in relation to Whidden is not entirely clear. Rigney recalls that Whidden was raising a knife above his shoulder as he ran, though no other officer testified that he had seen him running with the knife in his hand, and Whidden's father, Owen Whidden, testified that he never saw his son

4

run toward Rigney.  Rigney added that nothing prevented him from continuing to hold the position from where he was near the Whidden's home.  Rigney estimated that the distance between them was approximately fifteen feet when he first fired.  Rigney fired eight shots, "tracing" Whidden as he ran, first firing in an east-southeastern direction then firing more directly eastward.  Whidden was struck four times, once each on the right side of his chest, his right shoulder, his left forearm, and his torso.  He fell to the ground a third and final time, and Rigney's K-9 dog briefly bit at him until Rigney pulled him off.  When Rigney approached Whidden's body, he saw the knife, with an eight-inch blade and five-inch handle, laying in the grass next to him.  Whidden died at the scene.

Dayna Christine Clawson, as personal representative of Whidden's estate, filed suit against Deputy Rigney and the Palm Beach County Sheriff's Office.  The complaint included state-law claims for wrongful death against Rigney and the Sheriff's Office, an excessive force claim against Rigney under 42 U.S.C. § 1983, and a failure-to-train claim against the Sheriff's Office under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978).  The defendants moved for summary judgment, which the district court granted only as to the Monell claim.  The court held that there was a genuine issue of material fact as to whether Rigney used excessive force and that Rigney was not entitled to qualified immunity because, taking the facts in the light most favorable to the plaintiff, his conduct violated

5

Whidden's clearly established rights under the Fourth Amendment.    This interlocutory appeal followed.

## II.

We review the denial of summary judgment based on qualified immunity <u>de novo</u>, applying the same standard that governed in the district court.    <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013).    Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(a).    "If a government official moves for summary judgment asserting entitlement to qualified immunity, then the relevant facts are construed in the light most favorable to the non-movant -- <u>i.e.</u>, the plaintiff -- and the court should decide the issue based on those facts."    <u>Simmons v. Bradshaw</u>, 879 F.3d 1157, 1163–64 (11th Cir. 2018).    Because we make all reasonable inferences in favor of the non-moving party, "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version" of the story at this stage in the proceedings.    <u>Evans v. Stephens</u>, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (emphasis omitted).

Rigney argues that the district court erred in denying summary judgment on the ground of qualified immunity.    Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The purpose of the doctrine is to permit officials to perform their discretionary duties "without the fear of personal liability or harassing litigation." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

To receive the benefit of qualified immunity, a "public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)). After the defendant makes this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. To do so, the plaintiff must show (1) that the official violated the plaintiff's constitutional rights, and (2) that the right in question was clearly established at the time of the relevant events. Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015). The parties agree that Rigney was acting within the scope of his discretionary authority; the dispute centers on whether the plaintiff has met her burden to show that qualified immunity is nonetheless inappropriate.

Clawson alleges that Rigney's use of force against Whidden was constitutionally excessive. The Fourth Amendment right to be free from unreasonable searches and seizures "encompasses the right to be free from excessive force during the course of a criminal apprehension." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009). We evaluate whether an officer's use of force

7

was excessive under an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). The Supreme Court has instructed courts to look to several factors when evaluating a use of force under this standard, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. "Because this standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994).

We conclude that there is a genuine dispute of material fact precluding summary judgment on the issue whether Rigney violated Whidden's right to be free from the excessive use of force. We have previously recognized that the use of force outside the context of a criminal arrest, when no crime has been committed, "do[es] not fit neatly within the Graham framework." Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005) (quoting Graham, 490 U.S. at 396). Still, our task remains "balancing the 'nature and quality of the intrusion' against the 'governmental interest at stake'" to determine if the use of force was objectively reasonable. Id. (quoting Graham, 490 U.S. at 396).

The extent of the intrusion on Whidden's liberty cannot be overstated. Indeed, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." Tennessee v. Garner, 471 U.S. 1, 9 (1985). And it is undisputed that Whidden had committed no crime, so the first Graham factor, the severity of the offense, also weighs in favor of a finding of excessive force. For the same reason, it cannot be said that he was resisting arrest by the officers, since they had no basis to effect a criminal arrest. That leaves the remaining factor, "whether the suspect pose[d] an immediate threat to the safety of the officers or others." 490 U.S. at 396. The Supreme Court has held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Garner, 471 U.S. at 11. In determining whether Whidden posed an immediate threat, we must keep in mind that "the reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Mercado, 407 F.3d at 1157 (quoting Graham, 590 U.S. at 396).

On the summary judgment record before us, we agree with the district court that there are disputed facts about whether Whidden posed an immediate threat to the safety of the officers or others. At the time he was fatally shot, Whidden was moving away from the main group of officers. While he was getting closer to Deputy Rigney, he is never shown in the video footage taken from the two

9

surveillance cameras displaying the knife or making a threatening gesture. Indeed, several of the deputies on the scene testified that they did not see Whidden's knife until after they rolled over his dead body, which is evidence that could support a finding, for example, that Whidden had the knife tucked into his jacket. Further, the video footage indicates that as Whidden was running north, being pelted by the less-lethal sponge rounds, he fell twice, and was never fully upright before Rigney fatally shot him, which bolsters the inference that Whidden's arms were not free to wield the knife towards Rigney.

Nor does the footage show Whidden running directly toward Rigney in a manner that suggested he intended to attack him. He appears to have been moving away from the group of officers in pursuit of him, not purposefully charging at Rigney. Whidden's father testified that he never saw his son run toward Rigney, although it is unclear from where he viewed the encounter. In addition, the fact that Rigney's shots were fired in, as he testified, an "east southeast" direction while Whidden was running north and Rigney was moving east or south (the record is not definitive) provides further support for the idea that Whidden was running past Rigney, not charging toward him and placing him in imminent danger.

It is also worth noting that Whidden, by all accounts, was not armed with a gun. He had a knife somewhere on him, and there was at least fifteen feet between him and Rigney, which included a three-foot tall hedge that he would have had to

get over to attack Rigney.  See Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016) (observing that "a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun"); Garczynski v. Bradshaw, 573 F.3d 1158, 1169 n.3 (11th Cir. 2009) (recognizing that less is required for an officer to reasonably perceive an immediate threat when the suspect is armed "with a gun, rather than a knife").  Meanwhile, the other officers were pursuing Whidden from behind, and Rigney, for his part, was accompanied by a police dog.  Based on the video evidence and the testimony in the record, we are compelled to conclude that there was a material dispute of fact as to whether reasonable officers would conclude that Whidden posed an immediate threat to the safety of the officers or others.

We do not suggest, of course, that Rigney was required to "wait and hope for the best" in this situation.  Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted and alteration adopted).  We simply hold that there is a genuine dispute of material fact that prevents us from deciding as a matter of law that the use of force was objectively reasonable under the circumstances.  At this stage, we must take the facts in the light most favorable to the plaintiff; doing so, we conclude that Rigney was not entitled to use deadly force against Whidden, who was not suspected of committing any crime, was not taking any actions suggesting that he would attack an officer, and was not armed with a firearm.

11

To prevail, Clawson must also show that Rigney's actions violated clearly established law. Our case law sets out three pathways for a plaintiff to make this showing. See Vinyard v. Wilson, 311 F.3d 1340, 1350–52 (11th Cir. 2002). For starters, a plaintiff can point to a case with "materially similar" facts decided by the Supreme Court, the Court of Appeals, or the highest court of the relevant state. Id. at 1352. Or, a plaintiff can "show that a broader, clearly established principle should control the novel facts in this situation." Mercado, 407 F.3d at 1159. The final option is to demonstrate that "the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Clawson provides two cases from this Court that, she argues, found constitutional violations on "materially similar" facts to this case. The first is McKinney by McKinney v. DeKalb County, 997 F.2d 1440 (11th Cir. 1993). In McKinney, three officers responded to a 911 call from a woman saying that her 16-year-old son had locked himself in the bedroom with a butcher knife. Id. at 1442. An officer knelt near McKinney and spoke to him for about ten minutes, before he allegedly threw a small stick out toward another officer and began to get up from his seated position. Id. This officer then fired five shots at McKinney, striking

him three times and causing paralysis and the amputation of substantial part of his right leg.  Id.  This Court denied qualified immunity to the officer who fired the weapon, concluding that "[a]s alleged by the plaintiffs, . . . [McKinney] had previously put down his knife and was merely shifting position, not threatening the safety of any persons," at the time he was shot.  Id. at 1443.  Because "the facts [were] in dispute as to what happened that led [the officer] to fire his gun," the Court deemed summary judgment on qualified immunity inappropriate.  Id.

Second, Clawson points to Mercado, 407 F.3d 1152.  There, a woman called 911 to report that her husband, Mercado, was threatening to commit suicide.  Id. at 1154.  When officers arrived, Mercado was sitting on the kitchen floor with a telephone cord wrapped around his neck, holding a knife pointed toward his heart.  Id.  The officers ordered Mercado to drop the knife and he refused, without making any threatening gestures or remarks; fifteen to thirty seconds later, an officer fired a less-lethal weapon at him from a distance of about six feet away.  Id. at 1155.  Mercado was struck in the head, fracturing his skull and causing brain injuries.  Id.  A panel of this Court held that the officer was not entitled to qualified immunity because Mercado "was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head."  Id. at 1157–58.  The Court expressly rejected the argument that "the use of force [was] justified because suicidal subjects sometimes make erratic moves that can jeopardize the

13

safety of the officers on the scene," on the ground that there was "no indication that he made any threatening moves toward the police." Id. at 1157.

These two cases suffice to show the violation of a clearly established right, again making all factual inferences in the plaintiff's favor. Just like the plaintiffs in these cases, Whidden was subjected to deadly force when he was neither committing a crime nor posing an immediate threat to officer safety -- in fact, in both of these prior cases, the victim was armed with a very similar weapon and was substantially closer to the officers than Whidden was when he was shot and killed. The parties in this case dispute the characterization of Whidden's movements prior to him being shot, as did the parties in McKinney. And like the McKinney Court, we believe this dispute cannot be resolved on summary judgment. Under the version of the facts most favorable to the plaintiffs, Whidden made no threatening movements toward the officers and deadly force was employed nonetheless. McKinney and Mercado clearly established that under these facts in the summary judgment record, the use of force was excessive.[1]

---

[1] To the extent Rigney relies on Garczynski v. Bradshaw, 573 F.3d 1158 (11th Cir. 2009), that case is readily distinguishable from this one. There, we upheld the grant of qualified immunity where officers had surrounded a suicidal man in a car and shot him when he disobeyed the officers' commands by raising his gun and swinging it around toward one of the officers. Id. at 1168. Indeed, in that case, we expressly emphasized that the suspect was armed "with a gun, rather than a knife." Id. at 1169 n.3.

14

We affirm the district court's denial of summary judgment on Clawson's excessive force claim.[2]

**AFFIRMED.**

_____

[2] Rigney also asks this Court to reverse the district court's denial of summary judgment on Clawson's state-law wrongful death claim, arguing that this claim must fail if Rigney's use of force was constitutionally reasonable. See Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006). We have discretion to exercise jurisdiction "over an otherwise nonappealable district court decision, if we already have jurisdiction over another issue in the same case." Kelly v. Curtis, 21 F.3d 1544, 1555 (11th Cir. 1994). "Under this doctrine, a federal appellate court may address nonappealable orders if they are 'inextricably intertwined' with an appealable decision or if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir. 1999) (quoting Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 51 (1995)). Here, the appealable question whether Rigney is entitled to qualified immunity is not "inextricably intertwined" with the nonappealable decision to deny summary judgment on the state-law claim, and review of that determination is not "necessary to ensure meaningful review of" the qualified immunity issue. We therefore decline to exercise jurisdiction over the wrongful death claim and dismiss the appeal as to that issue.