[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-13632

_____

MEGAN GARCIA,
VICTOR REVILL,

                                        Plaintiffs-Appellees,

*versus*

PAMELA CASEY,
SCOTT GILLILAND,
SUE ASHWORTH,
BRIAN K. RATLIFF,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket Nos. 2:18-cv-02079-KOB,
2:19-cv-00114-KOB

_____

Before BRANCH and BRASHER, Circuit Judges, and WINSOR,* District Judge.

BRASHER, Circuit Judge:

The main question in this appeal is whether government officers are entitled to qualified immunity for arresting attorneys Megan Garcia and Victor Revill for stashing their client's cellphone in a bag only minutes before the police executed a search warrant for child pornography on that phone. Sheriff's deputies Sue Ashworth and Brian Ratliff made the arrest, and Garcia and Revill allege that District Attorney Pamela Casey and Assistant District Attorney Scott Gilliland ordered the arrest. Following the arrest, DA Casey, in a statement to the press, and ADA Gilliland, on the courthouse steps, publicly accused Garcia and Revill of concealing evidence of a crime and knowingly possessing child pornography.

After Garcia and Revill were tried and acquitted for the state-law crimes of obstructing governmental operations and refusal to permit an inspection, they filed this federal lawsuit. Garcia and

_____

* Honorable Allen C. Winsor, United States District Judge for the Northern District of Florida, sitting by designation.

Revill sued Deputies Ashworth and Ratliff, DA Casey, and ADA Gilliland for unlawful arrest. They also sued Casey and Gilliland for defamation. On cross motions for summary judgment, the district court entered judgment against Deputies Ashworth and Ratliff and denied DA Casey and ADA Gilliland's motion for summary judgment on the false arrest claim. The district court also denied the district attorneys' motion for summary judgment on Garcia and Revill's defamation claims, concluding that the district attorneys were not entitled to state-agent immunity under Alabama law.

This appeal is complicated by our inconsistent case law on qualified immunity for false arrest claims. Despite the Supreme Court clarifying the standards for assessing probable cause and qualified immunity in *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018), the courts in our Circuit have only sometimes applied that decision. Accordingly, we once again affirm that the test in *Wesby* should be applied to answer whether probable cause exists for an arrest or qualified immunity prevents liability for a false arrest claim.

Under *Wesby*, we believe the defendants are entitled to qualified immunity against the plaintiffs' false arrest claim. But we agree with the district court that the district attorneys are not entitled to immunity under Alabama law on the defamation claims. Alabama law makes clear that state-agent immunity is unavailable when the agent commits intentional tortious conduct, such as defamation. On remand, the district court should determine whether

to exercise pendent jurisdiction over those state-law claims given our resolution of the federal claims.

## I.

### A.

The parties' dispute arises against the background of two related investigations—one civil and one criminal—of a non-party named Lloyd Edwards. Garcia, an attorney at Revill's law firm, represented Edwards in proceedings related to the civil investigation conducted by the Blount County Department of Human Resources. But that civil investigation spawned a criminal investigation when investigators informed police of their belief that Edwards had committed child abuse and possessed child pornography.

In December 2016, Edwards's ex-wife filed a protection for abuse petition against Edwards in state court, which alleged sexual abuse of Edwards's minor stepdaughter. Garcia appeared in the case on behalf of Edwards with Revill accompanying her. The court set a hearing in that case for February 23, 2017.

Around the same time, Kerry Ward, an investigator at DHR, began looking into allegations that Edwards had sexually abused his stepdaughter. DHR received information that suggested the existence of inappropriate pictures of the stepdaughter on Edwards's cell phone. DHR workers also discovered that Edwards's Google account showed that he had been reviewing pornography that would best be categorized as legal pornography featuring actors

who purport to be 18 or 19 years old. In an interview with Ward, Edwards denied abusing his stepdaughter, but admitted that he had a pornography problem and viewed "teen porn" on his cell phone.

Ward consulted Sheriff's Deputy Ashworth, and they interviewed Edwards's stepdaughter and her mother in early January. The stepdaughter alleged that Edwards molested her. The mother told them that Edwards was a "porn addict" and that she had found "teen porn on his computer" and evidence of illicit pornography. Ward filed a petition for dependency against Edwards alleging sexual abuse and neglect. Deputy Ashworth began to consider criminal charges.

Returning to the protection from abuse dispute between Edwards and his ex-wife, two important things happened in the lead up to the February hearing. First, knowing that her client was under investigation by DHR, Garcia subpoenaed the DHR investigative file to be delivered to her at the February 23 hearing. Second, knowing that Edwards would appear at the courthouse for the hearing, Deputy Ashworth asked for and received a search warrant for "any and all cellular devices" in Edwards's possession that she intended to serve on Edwards after the hearing. Specifically, the warrant permitted Ashworth to search "the person of Lloyd Clinton Edwards and the vehicle driven by Lloyd Clinton Edwards." The warrant was issued based on Ashworth's belief that Edwards's phone contained evidence of child pornography.

On the day of the hearing, Deputy Ashworth and Deputy Brian Ratliff, who had agreed to help her execute the warrant at the

courthouse, monitored the hearing via "video surveillance monitors . . . located at the security desk." After the hearing, Ward delivered her DHR investigative file to the judge pursuant to Garcia's subpoena. Ward reported to Deputy Ashworth that the attorneys and the judge left with the file, and Ashworth saw the judge and "the attorneys for both sides" go out through "the rear of the courtroom" toward the judge's chambers. Deputy Ashworth knew that the DHR file detailed not only Edwards's family members' allegations of sexual abuse, but also contained "documents and details . . . about child pornography on Mr. Edwards'[s] cell phones." About fifteen minutes later, Deputy Ashworth watched as the attorneys returned to the courtroom with the file.

According to Ratliff, upon leaving the courtroom but "[p]rior to exiting the courthouse, Mr. Edwards and the attorneys stopped in a small alcove near the elevator on the first floor." The courthouse surveillance video shows Garcia and Revill speaking with Edwards in the small alcove for about ten minutes. After several minutes of discussion, Edwards takes out two of his phones and inspects them while the attorneys look on. After a few minutes, Edwards gives one to Revill who passes it to Garcia to stow in her satchel.

Deputy Ashworth had, by this point, "left the video monitoring desk to stand outside the courthouse and wait for Edwards'[s] exit to serve the search warrant." But Ward was still inside near the alcove where she "overheard Mr. Edwards and his attorneys discussing Mr. Edwards's phones." After hearing that,

she says that she "went to the security desk" and "informed [Deputy Ratliff] what was going on." They "watched the cameras" and saw Edwards "give his phone to the attorneys." Ward then texted Deputy "Ashworth and informed her of the phone exchange."

According to her testimony, Deputy Ashworth believed at this point that "the attorneys were trying to hide the child pornography evidence contained on the phones and elude a possible search warrant for the phones." But both Garcia and Revill deny having any knowledge that a search warrant existed for Edwards's phones or even that DHR suspected that Edwards had child pornography on his phones. Revill and Garcia claim that they took the phones from Edwards as evidence to use in the protection from abuse litigation.

Eventually, the officers confronted Edwards and his attorneys outside the courthouse. An officer's body camera recorded the exchange between Deputies Ashworth and Ratliff and attorneys Garcia and Revill. The body camera video reflects the following interactions.

Deputy Ratliff stops Edwards, Garcia, and Revill. Deputy Ashworth then approaches the group and says, apparently to Revill, "I have a search warrant for that phone [Edwards] just handed you. I'm from the Sheriff's Office." Revill says, "Here we go," accepts the search warrant, and begins to read it.

Revill, while reading the search warrant, notices Garcia begin to open the bag containing the cell phone. Revill lifts his finger to Garcia in an apparent "hold on" motion, and Garcia stops

opening the bag. After reading the warrant, Revill notes: "The warrant that you all have is for his person and his vehicle;" to which Deputy Ashworth responds, "that's correct." Revill then says, "[Edwards] has given [you] the phone that's on his person." Deputy Ratliff then says to Revill, "I have video of [Edwards] handing the phone to you, and you handing the phone to [Garcia], and it's in that satchel right now." Revill responds, "you do have that [on video] . . . but when you came out here and served this search warrant, that was not on his person. So you all are not entitled to that." Revill then hands the warrant back to Deputy Ashworth.

Deputy Ratliff then says, "we'll go the other route to get that other phone." At that point, Deputy Ashworth answers a phone call and steps out of the frame of the video. She says to the person on the other end of the call, "we've got it on video that he handed his cell phone to his attorney . . . and it's in the satchel that's right here." While Deputy Ashworth is still on the phone call, Revill asks Deputy Ratliff, "are we being detained?" Deputy Ratliff answers, "at this moment in time, I'm going to have to detain you until we determine the next course of action." Meanwhile, Deputy Ashworth says to the person on the other end of the phone call that "no, they're not denying [taking the phones], we've got it on video." She then reads the search warrant to the person on the other end of the call and says, "I've got [a warrant for] his person and vehicle." A silence of about twenty seconds passes before Deputy Ashworth approaches Revill and Garcia and informs them: "We either need the phone out of the satchel, or we will have to

detain you and get a search warrant to get the phone." Revill responds, "We're not going to run."

Then, Deputy Ashworth turns away from Garcia and Revill and speaks into her phone again: "Do what? Say it again." Deputy Ashworth turns around and tells Garcia and Revill, "You both are under arrest for obstructing governmental operations." Revill repeats, "Obstructing government operations?" Deputy Ashworth says, "[T]hat's correct."

Deputy Ashworth later testified that after she had served the search warrant, she called DA Casey to ask for legal advice about how to proceed regarding the phone in Garcia's bag. Deputy Ashworth said that she spoke to both DA Casey and ADA Gilliland on this call. Deputy Ashworth testified that at some point, Gilliland and Casey read her Section 13A-10-2 of the Alabama Code, which prohibits obstructing governmental operations. Deputy Ashworth claims that Casey then advised her to arrest Revill and Garcia. Casey and Gilliland both deny advising Deputy Ashworth to arrest Revill and Garcia.

In any event, we turn back to the video. After the arrests, Revill explains his "position" to the officers. He says, "[T]his search warrant . . . was given to [Edwards] after he gave us [the phones] to use in his defense. So we did not do anything to keep you all from doing you all's job. So if you want to take this satchel and go through it, we're not preventing you from that." Deputy Ratliff responds, "I understand your point, but understand ours. From the moment [Edwards] has entered this courthouse, he's been under

surveillance for the purposes of this warrant. I saw you, [Edwards] and [Garcia] get off the elevator . . . you looked up [at the security camera] two or three times . . . then he handed you the phone and you handed it to [Garcia] and she put it in that bag right there. And that is evidence for this search warrant." Revill then says, "And you agree that you served this search warrant subsequent to that. After that. Alright? And wouldn't you agree that we are not preventing you from getting to [the phones]?" Deputy Ratliff responds, "I mean, we can sit here and split these hairs all day."

As Garcia and Revill were being taken away, ADA Gilliland stood in the courthouse door and said aloud, "Y'all are the ones who are now knowingly in possession of child pornography? That was a bad mistake."

Deputy Ashworth charged Revill and Garcia with obstructing governmental operations and refusal to permit an inspection under Ala. Code § 13A-10-3. A state magistrate issued arrest warrants. Deputy Ashworth also obtained a search warrant for Garcia's bag and retrieved two cell phones. According to DA Casey, she later concluded that Deputy Ashworth had probable cause to arrest Revill and Garcia for obstructing governmental operations. After retrieving Edwards's phones, Deputy Ashworth sent them to the FBI for analysis; based on that analysis, she testified to her belief that "[t]he phones contained many images of child pornography."

About one month later, an article about the arrests appeared on a news website and attributed multiple statements to Casey. The article reports that Casey said, "officers had a search warrant

seeking recovery of any device or devices, including the subject's cell phone or cell phones, which were believed to contain child pornography." Further, she stated that "[w]ithin minutes of learning that their client was alleged to have used his cell phone to produce and/or view child pornography, Mr. Revill and Ms. Garcia took possession of their client's phones and attempted to conceal the phones from law enforcement." Casey told the reporter that Garcia and Revill's acts were "not only illegal, but unethical." Finally, she said the District Attorney's Office "will not be intimidated by a lawyer or anyone else who continues to attempt to manipulate the judicial process and/or criminal justice system by public grandstanding."

About a year after the arrests, a state judge entered directed verdicts of acquittal in the criminal cases against Revill and Garcia. Although Edwards was arrested, he has not been charged with any child pornography-related offenses as of the writing of this opinion.

*B.*

As it relates to this appeal, Garcia brought three claims: a Fourth Amendment claim for unlawful arrest under 42 U.S.C. § 1983 against Ashworth, Ratliff, Casey, and Gilliland; a defamation claim against Gilliland; and a defamation claim against Casey. For his part, Revill brought the same claims as Garcia and many more. But the district court found that Revill opposed summary judgment only on his Fourth Amendment unlawful arrest claim against Ashworth, Ratliff, Casey, and Gilliland and his defamation claims against Casey and Gilliland.

In ruling on cross motions for summary judgment, the district court determined that Deputies Ashworth and Ratliff did not have arguable probable cause to arrest Revill and Garcia. Accordingly, the court granted Garcia and Revill's motions for summary judgment as to the liability of Deputies Ashworth and Ratliff for unlawful arrest. It therefore denied Deputies Ashworth and Ratliff's motions for summary judgment on unlawful arrest. The court also denied Casey and Gilliland's motions for summary judgment on Garcia and Revill's unlawful arrest claims based on qualified immunity. But Garcia and Revill did not move for summary judgment as to Casey and Gilliland's Fourth Amendment liability for allegedly advising Deputies Ratliff and Ashworth to arrest them. Finally, the district court found that there were genuine issues of material fact as to Garcia and Revill's defamation claims against Casey and Gilliland. It therefore denied all parties' motions for summary judgment as to the defamation claims and allowed the claims to proceed to trial. Ashworth, Ratliff, Gilliland, and Casey timely appealed.

## II.

We review *de novo* both "a probable cause determination," *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012), and "the district court's determination of state law," *Price v. Time, Inc.*, 416 F.3d 1327, 1334 (11th Cir. 2005). The district court's denial of summary judgment on the defense of qualified immunity constitutes "an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

*Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). And because Casey and Gilliland appeal "both the denial of [state-agent] immunity and the denial of qualified immunity from the same procedural posture and under the identical assumption regarding the validity of the district court's summary-judgment facts," the collateral-order doctrine furnishes this Court with appellate jurisdiction to review the denial of Casey and Gilliland's state-agent-immunity defenses. *Taylor v. Adams*, 221 F.3d 1254, 1260 n.9 (11th Cir. 2000).

## III.

Garcia and Revill brought federal and state claims, and the defendants have raised distinct defenses as to those claims. All the defendants argue that the district court erred in denying them qualified immunity on the plaintiffs' federal false arrest claims. Casey and Gilliland also argue that the district court erred in denying them state-agent immunity on the plaintiffs' state-law defamation claims.

We agree with the first contention but disagree with the second. Because of the defendants' collective knowledge at the time of arrest, we hold that they are entitled to qualified immunity because they had arguable probable cause to arrest Garcia and Revill. That is, we believe "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests here." *Wesby*, 138 S. Ct. at 593. On the other hand, we conclude that Casey and Gilliland cannot be afforded state-agent immunity for defamation. Even if Casey and Gilliland made their allegedly defamatory statements as part of their

official duties, the Supreme Court of Alabama has held that state-agent immunity does not protect against intentional defamation.

### A.

We will start with qualified immunity for the federal claims. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred. *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016). "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Id.* "First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right." *Id.* "Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct." *Id.* "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)) (internal quotation marks omitted).

A plaintiff can demonstrate that a right was clearly established in three ways. First, "materially similar" case law may give

an officer fair notice that his conduct would violate a constitutional right. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Second, the plaintiff can show the existence of a "broader, clearly established principle [that] should control the novel facts [of his] situation." *Id.* In other words, even "[i]f there is no case law directly on point, general statements of the law contained within the Constitution, statute, or caselaw may sometimes provide 'fair warning' of unlawful conduct." *Id.* (quotation omitted and alteration adopted). Finally, in rare instances, an official may still have notice when his conduct "so obviously violates" a constitutional right. *Id.* Absent one of these standards being met, an officer is entitled to qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Although prosecutors generally are entitled to absolute immunity for actions taken as an advocate for the state, a prosecutor may only be afforded qualified immunity when performing a function outside of that role. *Jones v. Cannon*, 174 F.3d 1271, 1282–83 (11th Cir. 1999) (recognizing a "prosecutor has only qualified immunity when performing a function that is not associated with his role as an advocate for the state"). This exception includes cases when prosecutors give legal advice to the police during an investigation. *Burns v. Reed,* 500 U.S. 478, 496 (1991). Accordingly, even though Casey and Gilliland cannot rely on absolute prosecutorial immunity in defending against the false arrest claims, they may raise the defense of qualified immunity.

Everyone agrees, and the district court held, that the defendants were performing discretionary functions when they arrested Garcia and Revill. But the district court denied their qualified immunity defense because it held that the officers did not have "arguable probable cause" to make an arrest.

The defendants argue that the district court erred in two respects. First, the defendants argue that the district court applied the wrong legal standard to assess qualified immunity for a false arrest claim. Second, the defendants argue that, under the correct standard, they had arguable probable cause to arrest Garcia and Revill. We agree and address each contention in turn.

1.

We will start with the legal standard for assessing a qualified immunity defense to a false arrest claim. An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). Probable cause is established where facts, "derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance

of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *Wesby*, 138 S. Ct. at 588).[1]

But to establish the defense of qualified immunity for a false arrest claim, we have held that "an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown*, 608 F.3d at 734 (internal citation omitted). An officer has *arguable* probable cause if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Wesby*, 138 S. Ct. at 593. An officer lacks arguable probable cause only if "the state of the law on the date of the alleged misconduct makes it obvious that the [officer's] acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington*, 25 F. 4th at 903 (quotation omitted). Accordingly, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular

---

[1] As we explained in *Washington*, the probable cause standard this Court applied in *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018), and on which the district court relied, is incorrect. 25 F.4th at 900–02. The incorrect standard required "facts and circumstances" that "would cause a prudent person to believe" a crime was committed. *Id*. at 899. The correct standard, promulgated by the Supreme Court in *Wesby*, is "whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." 138 S. Ct. at 588. Accordingly, the district court erred, as did this Court in *Cozzi*, when it applied the outdated probable cause standard.

circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) (emphasis omitted).

We have not often explained how the doctrine of "arguable probable clause" relates to the defense of qualified immunity more generally. The touchtone of qualified immunity is that officers must be "on notice their conduct is unlawful" before being held personally liable for a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). And, as explained above, we have recognized three ways to establish notice on the part of an officer. First, there may be an existing judicial precedent "where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. at 590 (quotation omitted and alteration adopted). Second, there may be a source of law—such as a statute—that is so clearly on point that a precedent with similar circumstances is unnecessary. *Mercado*, 407 F.3d at 1159. Third, the officer's conduct might be so egregious or outrageous that every reasonable officer would know the conduct is unlawful. *E.g.*, *Patel v. City of Madison*, 959 F.3d 1330, 1343–44 (11th Cir. 2020) (excessive force).

We believe the doctrine of "arguable probable cause" is a useful shorthand to collapse these three inquiries into a single question in a wrongful arrest case. That is, we must ask whether "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Wesby*, 138 S. Ct. at 593. So an officer may lack arguable probable cause because an existing precedent establishes that there

was no actual probable cause for an arrest on similar facts. Or an officer may lack arguable probable cause because the text of an applicable statute plainly precludes him from making an arrest under that statute. Or the officer may have been so lacking in evidence to support probable cause that the arrest was obviously unconstitutional. But the arguable probable cause inquiry in a false arrest case is no different from the clearly established law inquiry in any other qualified immunity case. Unless the law "makes it obvious that the [officer's] acts violated the plaintiff's rights," *Washington*, 25 F. 4th at 903, the officer has qualified immunity.

2.

We now apply this standard to the facts here. Under our precedents, the plaintiffs "bear[] the burden of proving both that the defendant violated [their] constitutional right[s] and that 'the right was clearly established at the time of the violation.'" *Washington*, 25 F.4th at 898 (quoting *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012)). Under the "any-crime rule" an officer is "insulate[d] from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Applying the "any-crime rule" to qualified immunity, an officer is entitled to qualified immunity if he had arguable probable cause to arrest a suspect for any crime, even if that crime was not "'the offense announced by the officer at the time of the arrest.'" *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir.

2002) (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).

The defendants argue on appeal that actual or arguable probable cause existed to arrest Garcia and Revill for obstructing governmental operations.[2] The existence of actual or arguable probable cause "depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735 (citing *Skop*, 485 F.3d at 1137−38). To determine whether an official had actual or arguable probable cause for an arrest, "we must look at the totality of the circumstances," *Washington*, 25 F.4th at 902 (quotation omitted), including what the officials knew at the time of the arrest. *Wesby*, 138 S. Ct. at 592; *Jones*, 174 F.3d at 1283. This inquiry includes "the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). *See also Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) ("Probable cause may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information.").

We will assume without deciding that the officers lacked *actual* probable cause to arrest the plaintiffs for obstructing

---

[2] The defendants argue in the alternative that probable cause or arguable probable existed to arrest Garcia and Revill for evidence tampering and possession of child pornography. The plaintiffs argue that the defendants waived these arguments by failing to raise them in the district court. We need not address these arguments because of our conclusion that there was arguable probable cause to arrest the plaintiffs for obstructing governmental operations.

governmental operations, but, examining the totality of the circumstances, we conclude that they had *arguable* probable cause. Section 13A-10-2 of the Alabama Code criminalizes "obstructing governmental operations." In relevant part, the statute provides that "[a] person commits the crime of obstructing governmental operations if" the person "[i]ntentionally obstructs, impairs or hinders the administration of law or other governmental function" "by means of intimidation, physical force or interference or by any other independently unlawful act." Ala. Code § 13A-10-2(a)(1).

For starters, the plaintiffs have not pointed us to an Alabama or federal court that has found an absence of probable cause to arrest under Alabama's obstruction statute in a similar situation. The Alabama courts have interpreted this statute to require that a person must physically interfere with law enforcement to be liable. *See D.A.D.O. v. State*, 57 So. 3d 798, 806 (Ala. Crim. App. 2009). That is, "words alone" are not enough. *Id.* But, other than that line of cases, the Alabama courts have not interpreted the statute in any meaningful respect.

For our part, we have examined Alabama's obstruction statute three times in the context of probable cause for an arrest, but our opinions in those cases do not support the plaintiffs. In *Grider v. City of Auburn*, our only published opinion, an officer argued that he had probable cause because the plaintiff had interfered with an arrest. We rejected that argument, and denied qualified immunity, because Alabama's obstruction statute expressly "does not apply to 'the obstruction, impairment or hindrance of the making of an

arrest.'" 618 F.3d at 1258 (quoting Ala. Code § 13A–10–2(b)). Our two unpublished opinions are equally unhelpful to the plaintiffs because we found at least arguable probable cause for both arrests. *See Dawson v. Jackson*, 748 Fed. Appx. 298 (11th Cir. 2018) (arguable probable cause when plaintiff prevented officers from abating a nuisance on his property without a search warrant); *Phillips v. Irvin*, 222 Fed. Appx. 928, 929 (11th Cir. 2007) (arguable probable cause existed when plaintiff refused to "back off" during traffic stop).

None of these authorities provided notice to the defendants that arresting Garcia and Revill for obstruction would have violated their rights under the Fourth Amendment. *Grider* is distinguishable because it involved an arrest for a reason that the statute expressly forbids. *Dawson*, although unpublished, is the most factually analogous decision, and it suggests that the law was not clearly established in the plaintiffs' favor. *See Corbitt v. Vickers*, 929 F.3d 1304, 1319 n.14 (11th Cir. 2019) ("[N]on-binding persuasive authority can be used to indicate that a particular constitutional right is not clearly established."). There, the plaintiff was arrested because he obstructed the officers from executing a nuisance abatement order on his property. *Dawson*, 748 F. App'x at 299. Here, the plaintiffs were arrested because they interfered with the officers' execution of a search warrant by taking the target's property into their possession. In *Dawson*, as here, the plaintiff told the officers that he would cooperate if they secured a warrant. *Id.* at 299. But we nonetheless concluded in *Dawson* that the officers had arguable probable cause to arrest him under Alabama's obstruction statute.

Because there is no factually analogous case law that supports the plaintiffs' position, we ask whether the text of the obstruction statute itself clearly established that the defendants lacked probable cause on these facts. The statute is broad in scope. It provides that a "person commits the crime of obstructing governmental operations if, by means of . . . interference or by any other independently unlawful act, he . . . [i]ntentionally obstructs, impairs or hinders the administration of law or other governmental function." Ala. Code § 13A-10-2. Notably, "administration of law" is not defined under the applicable title. *See* Ala. Code § 13A-10-1 (definitions section).

Although we do not and need not definitively resolve this state statute's meaning, a reasonable interpretation of the obstruction statute is that it prohibits hiding evidence of a crime from law enforcement. *Cf.* U.S.S.G. § 3C1.1, App. Note 4(d) (noting that "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" is an example of obstructive conduct). Indeed, Garcia and Revill do not argue otherwise. Instead, they argue that the defendants had insufficient reason to believe that they were hiding their client's phone from law enforcement.

We cannot agree. Looking at what the defendants collectively knew at the time of the arrest, one can see how a reasonable officer could conclude that the plaintiffs' actions—at least as the defendants perceived them—fit the obstruction statute. Deputy Ashworth was at the courthouse to execute a search warrant on

Edwards with specific authorization to seize his cell phones. She was aware through interviews with Edwards, his wife, and his stepdaughter, that Edwards's phone likely contained child pornography. The DHR investigation file reflected that Edwards had allegedly used his cellphone to take explicit photographs of his stepdaughter. Edwards' attorneys had received the DHR file at a hearing. Shortly after the hearing, the officers then witnessed Edwards review one of his phones and hand it to his attorneys who stashed the phone in a bag. By taking possession of the phone even though the police were waiting to execute a warrant to seize it, the attorneys arguably "hinder[ed] the administration of law" by a physical act.

Garcia and Revill also argue that their status as attorneys undermines probable cause to believe that they *intended* to hide evidence of a crime. Again, we disagree. Attorney misconduct is all too common. *See* Douglas R. Richmond, *Understanding the Crime-Fraud Exception to the Attorney-Client Privilege and Work Product Immunity*, 70 S.C.L. REV. 1, 4–5 nn. 18–32 (2018) (collecting cases). And Alabama's obstruction statute does not exempt attorneys. *See generally* Ala. Code § 13A-10-2. In fact, no one disputes that an attorney could violate the obstruction statute if she intentionally hid evidence that her client had committed a crime to prevent its discovery by law enforcement. *See e.g., In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987) (an "attorney's assistance" may not be "obtained in furtherance of . . . criminal or fraudulent activity").

Garcia and Revill next argue that they should not have been arrested because they had an innocent explanation for taking possession of Edwards's phones. But the Supreme Court has held that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588. Intent must be inferred from actions. And, here, an officer could reasonably infer that Garcia and Revill intended to stop the police from examining their client's phone, even if they could not have known the police would come that very day.

Relatedly, the district court held that the officers lacked arguable probable cause because the plaintiffs could not have known that a search warrant had been issued for the phone when they took it. We cannot agree that this distinction undermines arguable probable cause to arrest under the obstruction statute. Of course, the case for criminal intent would be stronger here if the attorneys had known that the police were only moments away from executing a search warrant when they stashed their client's phone in their bag. But nothing in the statute suggests that someone who intends to hide or destroy evidence of a crime can be held liable for obstruction only if he knows that the police are already on their way. In fact, other Alabama criminal laws explicitly reject this distinction. *Cf.* Ala. Code §13A-10-129(a)(1) ("A person commits the crime of tampering with physical evidence if, believing that an official proceeding is pending *or may be instituted*, . . . [the person] . . . conceals, [or] removes . . . physical evidence with intent to impair its . . . availability in the pending *or prospective proceeding*." (emphasis added)).

In short, we think a reasonable officer "could have interpreted," *Wesby*, 138 S. Ct. at 593, the obstruction statute to preclude hiding evidence of a crime and could have concluded from this unusual chain of events that the attorneys took their client's phone for that purpose. We concede, as the state court found in the state criminal action, that Garcia and Revill's conduct does not fit squarely within the obstruction statute. They did not, for example, destroy the phone or flee from the officers when confronted outside the courthouse. But our precedent makes clear that the eventual weakness of the criminal case against the plaintiffs does not preclude a finding that actual or arguable probable cause existed. *See Wood v. Kesler*, 323 F.3d 872, 880 n.12 (11th Cir. 2003).

Lastly, despite the lack of materially similar case law or a mismatch between the facts and the text of the applicable statute, Garcia and Revill argue that the violation here was so clear and obvious that any reasonable officer would know that the arrest violated the law. Specifically, they argue that no reasonable police officer would believe that he could arrest someone just for refusing to provide consent for a search.

We do not doubt that all reasonable officers know that it is unconstitutional to arrest someone merely because she refuses to consent to a search. *See United States v. Alexander*, 835 F.2d 1406, 1409 n.3 (11th Cir. 1998) ("[A] defendant's refusal to consent to a search cannot establish probable cause to search."). But this argument ignores the context of the arrest. Garcia and Revill were arrested only after officers secured a warrant to seize a phone and

witnessed them take possession of that phone in a way that would prevent its discovery by law enforcement. As explained above, it is not unreasonable for an officer to believe that the conduct the officers witnessed was criminal. Accordingly, we cannot say that this is "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 591 (quoting *Brosseau*, 543 U.S. at 199).

In summary, we do not decide whether hiding evidence violates the Alabama obstruction statute or whether the defendants had actual probable cause under that statute. We are confident that, even if the defendants did not have probable cause, their error did not violate clearly established law, entitling them to qualified immunity.

### B.

We now turn to the state-law defamation claims. Along with denying Casey and Gilliland's motion for summary judgment on Garcia and Revill's false arrest claims, the district court denied them state-agent immunity under Alabama law. Casey and Gilliland argue that they are entitled to state-agent immunity for their public statements alleging that Garcia and Revill engaged in unethical and criminal conduct by intentionally harboring child pornography. We disagree.

To establish a prima facie case of defamation under Alabama law, a plaintiff must show (1) "that the defendant was at least negligent" (2) "in publishing" (3) "a false and defamatory statement to

another" (4) "concerning the plaintiff," (5) "which is either actionable without having to prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm (actionable *per quod*)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988). When the defamation claim is brought against a state official, whether state-agent immunity exists should be answered before undertaking the prima facie inquiry. *See Gary v. Crouch*, 867 So. 2d 310, 313 (Ala. 2003) (addressing immunity before deciding whether the plaintiff had established a prima facie case).

"State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). Under Alabama law, state agents "shall be immune from civil liability" in personal-capacity suits where the conduct forming the "basis of the claim against the agent" falls within any of the five following categories: "(1) formulating plans, policies, or designs"; "(2) exercising his or her judgment in the administration of a department or agency of government"; "(3) discharging duties imposed on a department or agency by statute, rule, or regulation"; "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons"; or "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality op.); *see also Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000) (majority adopting *Cranman* test). Further,

state-agent immunity "shall not" attach if "the [s]tate agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405.

Alabama courts have found that the so-called *Cranman* categories are flexible and encompass a broad suite of enumerated and unenumerated discretionary actions. *Howard v. City of Atmore*, 887 So. 2d 201, 206 (Ala. 2003) ("*Cranman* is a *restatement* of the law of immunity, not a *statute*."). Like qualified immunity, state-agent-immunity doctrine "ha[s] established a 'burden-shifting' process when a party raises the defense." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). Under that framework, the defendants "bear the burden of demonstrating that [plaintiffs'] claims arise from a function that would entitle them to immunity." *Id.* "If the [defendants] make such a showing, the burden then shifts to [plaintiffs], who, in order to deny [defendants] immunity from suit, must establish that [defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority." *Giambrone*, 874 So. 2d at 1052.

The district court concluded that none of Casey's or Gilliland's conduct fell under the *Cranman* categories. But as Casey and Gilliland point out on appeal, responding to press inquiries and speaking to detainees falls "under executing their work responsibilities" as prosecutors. *Ex parte Hayles*, 852 So. 2d at 122. The National District Attorneys' Association has recognized that responding to media inquiries specifically as "[a]n appropriate and professional relationship with the media *is necessary* to promote public

accountability and transparency in government." Nat'l Dist. Att'ys Ass'n, *National Prosecutor Standards* § 2-14.1 Commentary (3d ed. 2009) (emphasis added). Accordingly, the district court erred in concluding that Casey and Gilliland's actions did not fall under any of the *Cranman* categories.

But as explained above, even if an official's conduct falls under one of the *Cranman* categories, an official is not entitled to state-agent immunity if he has acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405. This principle means that "[s]tate-agent immunity[] does not provide immunity from liability for the commission of an intentional tort, but only for negligence in the exercise of judgment." *Gary*, 867 So. 2d at 314 (citing *Ex parte Turner*, 840 So. 2d 132, 136 (Ala. 2002)).

The Alabama Supreme Court has also held that, when a plaintiff establishes a prima facie case of intentional defamation, the speaker is not entitled to state-agent immunity. Three such precedents are relevant here.

In *Gary*, the Alabama Supreme Court concluded that a police chief was not entitled to police-agent immunity where he committed the intentional tort of defamation by circulating a letter that contained false statements about one of his lieutenants. *See id.* at 313–14. In doing so, the court recognized that "[p]eace-officer immunity, like [s]tate-agent immunity, does not provide immunity from liability for the commission of an intentional tort, but only for

negligence in the exercise of judgment." *Id.* (citing *Ex parte Turner*, 840 So.2d at 136).

Likewise, in *Ex parte Pinkard*, No. 1200658, ___ So. 3d ___, slip op. at 21 (Ala. May 27, 2022), the Alabama Supreme Court held that a deputy fire marshal was not entitled to state-agent immunity for the tort of defamation because the fire marshal allegedly "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." § 36-1-12(d)(2). The court concluded that the plaintiff had "put forth evidence that [the agent] misrepresented his denials as a confession." *Id.* at 24 Like the officials here, the agent supposedly defamed the plaintiff by claiming he had committed a crime by "falsely represent[ing] that [the plaintiff] had 'admitted' to starting [a] fire" that the agent determined was arson. *Id.* at 23.

Similarly, in *Slack v. Stream*, the Alabama Supreme Court held that a university department head was not entitled to state-agent immunity in a defamation suit where the department head disseminated a letter that falsely accused the plaintiff, a professor, of plagiarism. 988 So. 2d 516, 531 (Ala. 2008). The court explained that the department head "acted willfully and maliciously in disseminating the letter of reprimand." *Id.*

Turning back to this case, the district court held that the evidence taken in the light most favorable to Garcia and Revill established that Casey and Gilliland committed the tort of defamation. The plaintiffs argue that the record further establishes that Casey and Gilliland's "statements were made intentionally, or, at a

minimum, it is a question of fact for a jury to decide if they were intentional." We agree. Casey and Gilliland have not challenged the district court's conclusion that the plaintiffs established a prima facie case of defamation, nor did they meaningfully argue that the plaintiffs produced insufficient evidence of intentionality. And, as far as intentionality goes, it is hard to see how the statements at issue here are meaningfully different from the statements at issue in *Gary*, *Pinkard*, or *Slack*. Because state-agent immunity does not provide a defense against the intentional tort of defamation, the district court did not err in denying Casey and Gilliland summary judgment.

## IV.

For the aforementioned reasons, the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**. The action is **REMANDED** to the district court with instructions to enter judgment for Ashworth, Ratliff, Casey, and Gilliland on Garcia and Revill's false arrest claims. On remand, the district court should determine whether to exercise pendent jurisdiction over the defamation claims given our resolution of these federal claims.